**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| W.S.R. and C.D.A., | ) | |
| | ) | |
| Plaintiffs, | ) | Nos. 18 C 04265 and 18 C 04291 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| JEFFERSON B. SESSIONS III, Attorney | ) | |
| General of the United States, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In two separate cases, minors W.S.R. and C.D.A. challenge the placement decisions of the United States government after the boys (who are not related to one another) were forcibly separated from their fathers shortly after the father-son pairs crossed the United States-Mexico border in May 2018. W.S.R. R. 14, W.S.R. Am. Compl.; C.D.A. R. 10, C.D.A. Am. Compl.[1] Both W.S.R. and C.D.A. filed motions for a temporary restraining order, W.S.R. R. 18-2, W.S.R. Mot. TRO; C.D.A. R. 15-2, C.D.A. Mot. TRO, and after holding a hearing, the Court granted the motions as to one type of relief, but converted the motions into a preliminary-injunction motion with an expedited briefing schedule as to the other types of relief sought by W.S.R. and C.D.A. W.S.R. R. 21, C.D.A. R. 16, 6/29/18 Order. For the reasons discussed below, Plaintiffs' motion for a preliminary injunction is granted in part and denied in part. The

---

[1]Citations to the record in 18 C 04265 are noted as "W.S.R. R." and to the record in 18 C 04291 are noted as "C.D.A. R." followed by the docket number and the page or paragraph number.

government must reunify W.S.R. and C.D.A. with their respective fathers within 72 hours of the posting of this Opinion on the docket. The government also must not remove the fathers from the country without their sons. But the other requests for relief, including ordering the release of their fathers from immigration detention, are denied.

## I. Background

### A. W.S.R.

W.S.R. turned 16 years old last week and is a citizen of Brazil. W.S.R. R. 18, Exh. A, ███████ Decl. ¶ 2. His father is ███████████, a former resident of Ipatinga, Minas Gerais, Brazil. *Id.* ¶ 1. In May 2018, ███████ and W.S.R. fled Brazil in order to request asylum in the United States. *Id.* ¶¶ 18-20. For the five months before entering the United States, ████████ and W.S.R. lived together in Brazil, and fled because they were being targeted with death threats by a drug trafficker who lived in their neighborhood. *Id.* ¶¶ 5-9. ██████████ and W.S.R. attempted to relocate within Brazil, but still did not feel safe and feared for their lives. *Id.* ¶¶ 10-11. ██████████ feared seeking police protection because of allegedly rampant corruption in the Brazilian police force. *Id.* ¶ 12. ██████████ alleges that he and W.S.R. cannot evade the drug trafficking network anywhere in Brazil, and if they return to Brazil, they will be killed. *Id.* ¶¶ 13-15. ██████████ did not tell W.S.R. every detail about the threats because ██████████ did not want to worry his son. *Id.* ¶ 16.

On May 23, 2018, ██████████ and W.S.R. allegedly tried to present themselves at a port of entry at the United States border to seek asylum, but were told that the port of entry was closed. ██████████ Decl. ¶¶ 19-20. ██████████ and W.S.R. then entered the United States outside of a port of entry and were stopped by Customs and Border Patrol (CPB) officers. *Id.* ¶ 20. Two days later, on the night of May 25, a guard told ██████████ he was being transferred to a jail and that W.S.R. would be separated from him for two or three days, or at most five. *Id.* ¶ 22. W.S.R. cried a lot when he learned of the separation. *Id.* ¶ 23. Father and son have not seen each other since that day.

### B. C.D.A.

The other plaintiff in this case is C.D.A. He is 9 years old and a citizen of Brazil. C.D.A. R. 18, Exh. A, ██████████ Decl. ¶ 2. His father is ██████ ██████████, a former resident of Capitão Andrade, Minas Gerais, Brazil. *Id.* ¶ 1. ██████████ borrowed $8,000 from a loan shark in Brazil in order to get to the United States. *Id.* ¶ 3. The loan shark belongs to a large group of human traffickers. *Id.* ¶¶ 3, 6. According to ██████████, the human traffickers are part of a large criminal organization in Brazil, and the organization also runs a drug trafficking operation. *Id.* ¶ 10. Back when ██████████ was a teenager, he refused to join the operation and the drug traffickers attacked him and burned him with a hot knife. *Id.* ¶¶ 7-9. He alleges that if he and C.D.A. return to Brazil, they will be forced into indentured servitude or killed. *Id.* ¶¶ 11-16.

Like W.S.R. and his father, C.D.A. and ▮▮▮▮▮▮▮▮▮▮ allegedly tried to present themselves at a port of entry on May 23, 2018, but were told that the port was closed. ▮▮▮▮▮▮▮▮ Decl. ¶ 17. That same day, they crossed outside of a port of entry and were detained. *Id.* ¶¶ 18-19. Two days later, a guard told ▮▮▮▮▮▮▮▮ that the guard was taking C.D.A. to a facility for children, but that they would be separated for no more than five days. *Id.* ¶ 21. C.D.A. had never been separated from both his mother and father, and cried when ▮▮▮▮▮ said that they would be apart for three days, five days at the most. *Id.* ¶ 22. The two have not seen each other since.

### C. After the Separation

After being separated from their sons, both ▮▮▮▮▮ and ▮▮▮▮▮▮ ▮▮▮ were transferred to detention facilities in New Mexico where they were jailed—without knowing where their sons were being held. ▮▮▮▮▮ Decl. ¶ 24; ▮▮▮▮▮▮▮ Decl. ¶ 26. Both fathers appeared in court on a misdemeanor charge of entering the United States illegally. W.S.R. Mot. TRO at 5; ▮▮▮▮▮▮ Decl. ¶¶ 24-25; C.D.A. Mot. TRO at 5. Both pled guilty. W.S.R. Mot. TRO at 5; *see* ▮▮▮▮ Decl. ¶ 25; ▮▮▮▮▮▮▮ Decl. ¶¶ 24-25. ▮▮▮▮ was allegedly never allowed to address the court or explain that the port of entry was closed, and was sentenced to time served. ▮▮▮▮ Decl. ¶¶ 25-26. ▮▮▮▮▮▮ appeared in court in a group of around two dozen others who were also charged with unlawful entry. ▮▮▮▮▮▮ Decl. ¶¶ 24-25. He pled guilty and received time served. *See id.* ¶ 25.

After pleading guilty and receiving time-served sentences, both ██████████ and ████████████████ were returned to Immigration and Custom Enforcement's (ICE) custody and are now detained at separate detention centers in New Mexico. ████████ Decl. ¶¶ 27-28; W.S.R. Mot. TRO at 3; ████████████ ██████ Decl. ¶¶ 28-29. Meanwhile, both W.S.R. and C.D.A. were placed in the custody of the Department of Health and Human Services (HHS), specifically its Office of Refugee Resettlement (ORR). W.S.R. Am. Compl. ¶ 62; W.S.R. Mot. TRO at 3; C.D.A. Am Compl. ¶ 64; C.D.A. Mot. TRO at 3. ORR placed the boys at the Heartland International Children's Rescue Center (Heartland) in Chicago, Illinois, where they remain, separated from their fathers. W.S.R. Am. Compl. ¶ 62; W.S.R. Mot. TRO at 3; C.D.A. Am Compl. ¶ 64; C.D.A. Mot. TRO at 3.

On June 15, 2018—after three weeks of separation—██████████ was allowed to speak to W.S.R. on the phone for the first time since the separation. ████████ Decl. ¶ 29. W.S.R. was upset and told ██████████ that he did not think he would ever see him again. *Id.* ¶ 30. Sometime in around early June 2018, ████████ ██████ spoke to C.D.A. for the first time since being separated. ████████████ ██████ ¶ 27. The conversation was a brief one over the telephone. *Id.* During the week of June 18, ████████████████ had a second telephone conversation with C.D.A. *Id.* ¶ 31. C.D.A. said that he did not want anyone to go through what he was going through. *Id.* ¶ 32.

On around June 25, 2018, an ICE officer attempted to get ██████████ to sign a voluntary removal form, but the form was written in the English language, which

██████████ does not understand. *See* ████████ Decl. ¶ 35; W.S.R. Mot. TRO at

6. ████████ refused to sign it. *See* ████████ Decl. ¶ 35; W.S.R. Mot. TRO at

6. The parties reported during the July 5, 2018 hearing that ████████ has not

yet been interviewed to determine whether he has a credible fear of persecution as

part of his asylum claim. ████████████ did undergo a credible-fear

interview, and received a negative finding. C.D.A. Mot. TRO at 3. An immigration

judge has not yet reviewed that finding. *Id.*

### D. Preliminary Injunction in *Ms. L. II*

On June 26, 2018, the District Court for the Southern District of California

issued a class-wide injunction requiring the government to reunite minor children

under the age of five with their parents by July 10 and those five and over by July

26. *Ms. L. v. U.S. Immigration & Customs Enf't*, — F.Supp.3d —, 2018 WL 3129486,

at *12 (S.D. Cal. June 26, 2018) (*Ms. L. II*). ████████ and ████████

████ are members of the *Ms. L.* class. W.S.R. R. 30, C.D.A. R. 27, Gov't Resp. Br.

at 2. Class members may not be removed from the United States without their

children. *Ms. L. II*, 2018 WL 3129486, at *12. On June 29, 2018, this Court entered

the same non-removal limit, prohibiting the government from removing either ████

████████ without W.S.R. or ████████████████ without C.D.A.

6/29/18 Order at 2.

### II. Analysis

A preliminary injunction is "an extraordinary remedy that may only be

awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v.*

*Natural Res. Def. Council,* 555 U.S. 7, 22 (2008). To prevail on a motion for a preliminary injunction, the moving party must show (1) a likelihood of success on the merits; (2) a lack of an adequate remedy at law; and (3) an irreparable harm will result if the injunction is not granted. *Lambert v. Buss,* 498 F.3d 446, 451 (7th Cir. 2007). If the moving party meets these requirements, then the court balances the nature and degree of the potential harm to each party and the public interest. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.,* 549 F.3d 1079, 1086 (7th Cir. 2008).

### A. Reunification

The first claim at issue is Plaintiffs' request to be immediately reunited with their fathers. This is a narrower claim than the request that the reunification be effectuated by simultaneously releasing their fathers. As noted earlier, the class-action order in *Ms. L. II* already requires that the government reunite Plaintiffs with their fathers by July 26, which is the thirty-day deadline for children age five and over. Practically speaking, the government has stated that it intends to comply with the class-action order, 6/29/18 Order; Gov't Resp. Br. at 2, and does not directly oppose Plaintiffs' request for reunification—it only contests the timeline (and the broader request for simultaneous release of the fathers). Gov't Resp. Br. at 14, 18-19. The government asserts that the entry of additional reunification orders will impede its efforts to comply with *Ms. L. II. Id.* at 18-19.

Although the government's objection to reunification is limited to timing, a start-to-finish analysis of the reunification claim is necessary for two reasons. First,

the relative strengths of the parties' positions bear on the consideration of the preliminary-injunction factors, because ultimately the "court must somehow balance the nature and degree of the plaintiff's injury, the likelihood of prevailing at trial, the possible injury to the defendant if the injunction is granted, and the wild card that is the 'public interest.'" *Girl Scouts*, 549 F.3d at 1086 (quoting *Lawson Prods., Inc. v. Avent, Inc.*, 82 F.2d 1429, 1433 (7th Cir. 1986)). Second, in the *Ms. L.* case, the government recently asked for more time to confirm parentage and parental fitness with the under-five July 10 deadline approaching. *Ms. L.*, 18-cv-00248 (S.D. Cal. July 5, 2018), R. 86 at 4-8. It is true that the government represented that the delays are most likely to affect the reunification of minors with parents who have already been released from ICE custody. *Id.* But the solidity of the government's prior representations that the deadlines will be met has waned. In this situation, which all began with "a chaotic circumstance of the Government's own making," *Ms. L. II*, 2018 WL 3129486, at *11, it is appropriate to consider Plaintiffs' request for reunification with a skeptical eye to the government's prior representations.

### 1. Subject Matter Jurisdiction / Sovereign Immunity

The threshold inquiry in any case is to check whether subject matter jurisdiction applies. On the reunification claim—independent of the request for release of the fathers—jurisdiction is secure because Plaintiffs can rely on habeas jurisdiction, 28 U.S.C. § 2241, and federal-question jurisdiction, 28 U.S.C. § 1331. On habeas, both boys allege that their custody is unconstitutional, *see* § 2241(a), because they have a substantive due process right to be reunited with their fathers. *See*

W.S.R. Mot. TRO at 12; C.D.A. Mot. TRO at 11. To be sure, the typical habeas petition requires that the warden of the custodial facility, rather than supervisory government officials, be named as the respondents. *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004) ("[L]ongstanding practice confirms that in habeas challenges to present physical confinement—'core challenges'—the default rule is that the proper respondent is the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official."). But this case is atypical. On the reunification claim, Plaintiffs are not raising a "core challenge," but rather challenge being placed in custody separate from their fathers. So the habeas claims are properly brought against any government official with supervisory authority over Plaintiffs, *Ms. L. v. U.S Immigration & Customs Enf't*, 302 F. Supp. 3d 1149, 1158 (S.D. Cal. 2018) (*Ms. L. I*), and any sovereign immunity obstacle is overcome by § 2241(a)'s statutory authorization to seek a writ of habeas corpus against a federal official.

Independent of habeas jurisdiction, there is federal-question jurisdiction to consider Plaintiffs' claim that the substantive component of the Fifth Amendment's Due Process Clause requires reunification. 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").[2] And because Plaintiffs seek only injunctive relief

---

[2]Venue is proper in this District under 28 U.S.C. § 1391(e)(1). All remaining defendants are "officers or employees of the United States or any agency thereof acting in their official capacity or under color of legal authority." § 1391(e)(1); W.S.R. Am. Compl. ¶¶ 12-19; C.D.A. Am. Compl. ¶¶ 12-19. To trigger venue under § 1391(e)(1), only one named defendant needs to be an officer or employee of the United States or any federal agency. *See* § 1391(e)(1). It just so happens that all remaining named defendants are federal officers or

against federal agencies on the reunification claim, sovereign immunity is waived via the Administrative Procedure Act, 5 U.S.C. § 702. *See also Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 775 (7th Cir. 2011) ("[T]he waiver in § 702 is not limited to claims brought pursuant to the review provisions contained in the APA itself. The waiver applies when any federal statute authorizes review of agency action, as well as in cases involving constitutional challenges and other claims arising under federal law.").[3]

## 2. Likelihood of Success

With jurisdiction secure over the reunification claim, the first question in the preliminary-injunction analysis asks whether Plaintiffs have shown that they are likely to succeed on the claim. Plaintiffs allege that their continued separation from their fathers violates their substantive due process right to familial association.[4]

---

employees being sued in their official capacities. W.S.R. Am. Compl. at 1; C.D.A. Am. Compl. at 1; W.S.R. R. 26, C.D.A. R. 21, Notice of Voluntary Dismissal. Also, a substantial part of the events giving rise to the claim occurred in this District, because both W.S.R. and C.D.A. are residing in this District at Heartland, and thus are experiencing the separation from their fathers in this District. W.S.R. Am. Compl. ¶ 2; C.D.A. Am Compl. ¶ 2; § 1391(e)(1)(b), (e)(1)(c).

[3]In light of the alleged policymaking at the highest levels of the federal agencies, another possible exception to sovereign immunity would have been to seek injunctive relief by naming the federal supervisory officials in their individual, rather than official, capacities. In that situation, a *Bivens* claim for injunctive relief might be appropriate. *See Bunn v. Conley*, 309 F.3d 1002, 1009 (7th Cir. 2002) ("A *Bivens* claim can be brought as an allegation that a constitutional injury arose out of the actions of federal agents—regardless of the nature of the relief sought.") (citing *Farmer v. Brennan*, 511 U.S. 825, 851 (1994), and describing that case as "vacating the dismissal of a prisoner's *Bivens* action in which the prisoner sought injunctive relief"). Here, however, Plaintiffs brought only official-capacity claims, W.S.R. Am. Compl. ¶¶ 12-19, C.D.A. Am. Compl. ¶¶ 12-19, so there is no need to decide that issue at the moment.

[4]In their reply brief, Plaintiffs also assert that their continued separation violates procedural due process. Pls.' Reply Br. at 10-11. That claim was not specifically argued in Plaintiffs' original motions for a temporary restraining order. In any event, because their

W.S.R. Mot. TRO at 13; C.D.A. Mot. TRO at 13. To assess a substantive due process claim, the first step is to provide a "careful description" of the liberty interest at stake in order to promote restrained decision-making. *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)). Once the interest is concretely described, then the question is whether that interest is "fundamental"— that is, whether it is "so deeply rooted and sacrosanct that no amount of process would justify its deprivation." *Christensen v. Cty. of Boone, IL*, 483 F.3d 454, 462 (7th Cir. 2007) (citing *Glucksberg*, 521 U.S. at 720-21). If the liberty interest is indeed fundamental, then the next question is whether the government has interfered directly and substantially with that right. *Id.* (citing *Zablocki v. Redhail*, 434 U.S. 374, 386-87 & n.12 (1978)). And, finally, if the government has so interfered, then the court asks whether the government's action serves a legitimate governmental objective, or if instead it is "arbitrary, or conscience shocking, in a constitutional sense." *Id.* (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998)).

Here, the liberty interest at stake is a child's right to remain in the custody of his parent. That interest has long been recognized as a fundamental right. *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("It is cardinal with us that the custody, care[,] and nurture of the child reside first in the parents … ."); *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected.") (citing *Wisconsin v. Yoder*, 406 U.S. 205, 231-33 (1972); *Stanley v. Illinois*, 405 U.S. 645, 651

---

claim for reunification is likely to succeed based on the substantive due process right to family integrity, it is not necessary to address procedural due process right now.

(1972); *Meyer v. Nebraska*, 262 U.S. 390, 399-401 (1923)); *see also Ms. L. I*, 302 F.Supp.3d at 1161 (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000) ("The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests … .")); *Ms. L. II*, 2018 WL 3129486 at *6-7. As the Supreme Court put it *Quilloin*:

> We have little doubt that the Due Process Clause would be offended if a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.

434 U.S. at 255 (cleaned up).[5] To be sure, that is a general description of the right of children to be in the custody of their parents, and courts must remember to describe the liberty interest at stake carefully and concretely to match the context of the particular case.

In this case, the initial separation was triggered by the decision to prosecute W.S.R.'s and C.D.A.'s fathers for reentry misdemeanors, 8 U.S.C. § 1325, and to put the fathers in criminal detention; there was no basis for the separation premised on parental unfitness or danger to the children. The fathers' criminal detentions necessitated the separation of W.S.R. and C.D.A. But the fathers are now back in immigration custody, so the specific interest is a child's right to reunify with his parent in immigration custody, after the parent's criminal detention ends and absent parental unfitness or danger to the child. That specifically and concretely described right is supported by the long line of cases, cited above, that established and

---

[5] *See* Jack Metzler, *Cleaning Up Quotations*, 18 JOURNAL OF APPELLATE PRACTICE AND PROCESS 143 (2017).

continually reaffirm the fundamental right of a child to remain in the custody of a fit parent. Although Congress has broad authority to regulate immigration, even in that context the Supreme Court approved of a regulation that presumptively placed detained minors with their parents. *Flores*, 507 U.S. at 310 ("The list [of custodians] begins with parents, whom our society and this Court's jurisprudence have always presumed to be the preferred and primary custodians of their minor children."). Against all this, the government does not actually come right out and say that there is no right to reunification on these facts. Gov't Resp. Br. at 13-14. The government says only that the protection of the parent-child relationship is dependent on the "circumstances of a particular case," *id.* at 13, and the asserted right must be considered "in light of the fact" that the fathers are in immigration custody, *id.* at 13-14—but then offers no explanation, just a bare conclusion, that the fathers' immigration custody results in no valid substantive due process claim, *id.* at 14. That lack of argument, and the long-established recognition of a child's right to remain in a fit parent's custody, leads the Court to hold, at this preliminary stage, that the fundamental right to reunify with a fit parent in immigration custody does exist and does apply to W.S.R. and C.D.A.

With the fundamental right thus described and recognized, the next step in the analysis asks whether the government has directly and substantially interfered with the right to reunification. There is no doubt: it has. The government forcibly separated W.S.R. and C.D.A. from their respective fathers and is now maintaining the boys in a facility almost 1,000 miles away from the fathers.

The final question is whether the government's action serves a legitimate governmental objective, or if instead it is arbitrary or conscience-shocking.[6] Again the government does not actually come right out and say what objective it is trying to accomplish by keeping the boys separated from their fathers. *See* Gov't Resp. Br. at 13-14. The government's brief states only the outcome—the family is separated— without offering an objective, let alone a legitimate one. *Id.* at 14. The government does cite a case, *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003), for the general proposition that the right of familial association operates differently when the parent is imprisoned. And it is true that *Overton* upheld a state prison regulation that, among other things, barred prisoners from having any visitors (aside from attorneys and clergy) for two years if a prisoner committed two or more substance-abuse violations. 539 U.S. at 130, 134. *Overton* reasoned that the regulation "serves the legitimate goal of deterring the use of drugs and alcohol within the prisons. Drug smuggling and drug use in prison are intractable problems." *Id.* at 134. But *Overton* applied the highly deferential test that applies to prison regulations, which asks only whether the regulation has a "rational relation to legitimate penological purposes." *Id.* at 132. Not only is this a type of rational-basis review, that light standard of review applies only to regulations in *prisons*, where by definition inmates are serving criminal sentences, *id.* at 131, and thus are subject to *punishment*.

---

[6]It might very well be that interference with the fundamental right of a parent to maintain the custody and care of a child is subject to strict scrutiny, *see Troxel*, 530 U.S. at 80 (Thomas, J., concurring in the judgment), but there is no need to decide that issue because the government's action fails even under the more lenient standard.

Here, the fathers of W.S.R. and C.D.A. are no longer in criminal detention. They've served their time. And of course W.S.R. and C.D.A. have not been charged with any crime at all. So *Overton* has no direct applicability. Without any further explanation by the government on what objective is being served—and served legitimately—by separation, the government's insistence on keeping these boys from their fathers can only be deemed arbitrary and conscience shocking. Plaintiffs are likely to succeed on the reunification claim. Indeed, the irreparable harm inflicted on the boys reinforces why the separation shocks the conscience. That harm, and the inadequacy of any other relief, is discussed next.

### 3. Inadequate Remedy / Irreparable Injury

The next factors in assessing whether to issue a preliminary injunction are whether Plaintiffs are suffering irreparable harm and have no adequate remedy at law—that is, "the remedy must be seriously deficient as compared to the harm suffered." *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003). The record evidence demonstrates that the boys have suffered irreparable harm from the separation, and the ongoing separation is inflicting ongoing irreparable harm. First, remember that, at the outset of the separation, not surprisingly both boys cried when told that they would be separated from their fathers. ███████ Decl. ¶ 23; ███████████ Decl. ¶ 22. Based on what the government told the fathers, the boys were told—wrongly—that they would be separated for no more than five days. ███████ Decl. ¶¶ 22-23; ██████████ Decl. ¶¶ 21-22. Then, incommunicado from their fathers and in the custody of adults who did not speak

Portuguese, C.D.A. R. 15, Exh. B, Maldonado Aff. ¶ 5(d), (f), Plaintiffs were flown hundreds of miles away. During the approximately six weeks of separation, each boy has spoken only twice with his father. ███████████ Decl. ¶¶ 29, 33; ████████████ ███████ Decl. ¶¶ 27, 31.

Common sense would tell anyone that keeping these boys separated from the only family they have in the United States—in a facility where they have limited access to talk to their fathers and where very few people speak their language—is causing irreparable harm, for which no other form of relief, monetary or otherwise, would be adequate. But there is more than common sense. In the record is this plea of hopelessness from W.S.R., when he finally spoke to his father on the phone: "Dad, I'm never going to see you again." ███████████ Decl. ¶ 30. W.S.R. is "crying a lot and desperate to get out of the center where he is being held." *Id.* ¶ 31. As intense as that harm is, nine-year-old C.D.A. is suffering worse. A clinical psychologist, Dr. Michelle Cutler, interviewed and evaluated C.D.A. on July 2, 2018. C.D.A. R. 29, Exh. B, Clinical Assessment. Dr. Cutler also reviewed the records of Heartland Alliance, including daily monitoring logs, counseling notes, incident reports, and psychiatric records. *Id.* at 3. Based on this thorough and detailed assessment, Dr. Cutler opines that C.D.A. is suffering "severe anxiety and depression due to this separation." *Id.* at 4. This deterioration of mental health is showing up in both reported thoughts of self-harm and actual acts of self-harm, as well as harming others. *Id.* at 3, 4. Those are just examples of C.D.A.'s mental suffering; the Clinical Assessment is riddled with other cries for help that demonstrate the trauma of the separation. *Id.* at 2-4.

16

### 4. Balance of Equities / Public Interest

The final considerations in determining whether to issue a preliminary injunction requiring reunification—and if issued, the deadline for reunification—is the balance of the equities and the public interest. To balance the equities, "the court must compare the potential irreparable harms faced by both parties to the suit—the irreparable harm risked by the moving party in the absence of a preliminary injunction against the irreparable harm risked by the nonmoving party if the preliminary injunction is granted." *Girl Scouts*, 549 F.3d at1100. As just recounted above, the irreparable harm to W.S.R. and C.D.A. is obvious and intense. On the other side of the reunification ledger is nothing: the government has articulated no harm, let alone irreparable harm, that would result from reuniting the boys with their fathers. Indeed, the government has repeatedly said that it intends to comply with the *Ms. L. II* class-action order requiring that Plaintiffs be reunited with their fathers, either together in an ICE family residential center or by being released together. Gov't Resp. Br. at 18-19.

The key question, then, is timing: by when must the government accomplish the reunification? The government contends that reunifying Plaintiffs with their fathers on a faster track than the *Ms. L. II* order will impede its efforts to timely comply with that class-action order. Gov't Resp. Br. at 18-19. Plaintiffs argue that this hardship is self-inflicted. Pl.'s Reply Br. at 18-19. That is true: the government embarked on a zero-tolerance policy, bringing misdemeanor charges and separating thousands of children from their parents, without a plan for reunification after the

short time-served sentences. *Ms. L. II*, 2018 WL 3129486, at *11 (family separations are a product of "a chaotic circumstance of the Government's own making"). On these facts, there is no doubt that the scales of justice weigh entirely in Plaintiffs' favor.

What makes this a close call, however, is that the Court also must consider the public interest, "which includes the ramifications of granting or denying the preliminary injunction on nonparties to the litigation." *Girl Scouts*, 549 F.3d at 1100. It is true that the public interest is served by requiring reunification. *Ms. L. II*, 2018 3129486, at *11 (holding that "the public's interest in enforcing the criminal and immigration laws of this country would be unaffected by issuance of the requested injunction" whereas "[t]he public interest in upholding and protecting [the right to family integrity and association] in the circumstances presented here would be served by the issuance of the requested injunction"). But there are around 3,000 other children who have been separated from their parents, and picking out W.S.R. and C.D.A. to leapfrog over others poses the risk that diverting resources in order to effectuate the accelerated reunification for W.S.R. and C.D.A. would delay the reunification of other children.

Ultimately, however, the balance of equities favors accelerated reunification for W.S.R. and C.D.A. Yes, all of the children of the *Ms. L. II* class members are suffering irreparable harm, but the record evidence compiled in *this* case demonstrates that W.S.R. and C.D.A. are suffering *extreme* irreparable harm to their mental health. It might be that many other sons and daughters of *Ms. L. II* class members would be able to compile the same record evidence if they had the lawyers

and resources to do so. But the fact of the matter is that W.S.R. and C.D.A. have proven that every day of separation is causing dangerous harm to their mental health. And the entry of this order on July 9, 2018 means that the government should be reunifying most of the 100 or so under-five kids imminently (by July 10) and then moving on to devoting efforts to reunifying the remainder of the children. The government also has not raised any questions about the parental relationship between W.S.R. and ███████████████ or C.D.A. and ███████████████ ████, nor about either father's fitness to parent. The outcome of the balancing of equities, and consideration of the public interest, is this: absent any government filing alleging parental unfitness or danger posed by the fathers, the government must reunite C.D.A. with his father, ███████████████████████, and must reunite W.S.R. with his father, ██████████████, both within **72 hours** of the posting of this order on the docket.

### B. Release of the Fathers

Moving on from the reunification claim, Plaintiffs make much broader requests, specifically, for an order reuniting the sons with their fathers "somewhere within the jurisdiction of the Northern District of Illinois," and for an order "[r]eleasing Plaintiffs and their fathers from custody pursuant to the *Flores* Settlement and 8 C.F.R. 1236.3(b)(2)." Pls.' Reply Br. at 19.[7] As explained below, none of the grounds advanced by Plaintiffs—the *Flores* Agreement, the federal regulation, or substantive due process—authorizes this Court to order the release of Plaintiffs'

---

[7]Plaintiffs' counsel represent that the Catholic Charities of Chicago will sponsor the family for housing and support during any immigration proceedings. Pls.' Reply Br. at 19.

fathers from immigration detention or to specify where the fathers should be detained, including for purposes of reunification.

### 1. Judicial Review of Placement Under the *Flores* Agreement

The threshold issue for Plaintiffs' claim under the *Flores* Agreement is whether this Court has subject matter jurisdiction to decide it. By itself, the claim under the *Flores* Agreement does not allege that the boys' custody violates the Constitution or federal law, so habeas jurisdiction does not apply, 28 U.S.C. § 2241. *See Gutierrez-Chavez v. I.N.S.*, 298 F.3d 824, 827 (9th Cir. 2002), *opinion amended on other grounds*, 337 F.3d 1023 (9th Cir. 2003). But it is important to remember that subject matter jurisdiction is different from the merits of the claim. Jurisdiction is federal-court authority to *decide* the merits of a legal claim. When properly conceived, subject matter jurisdiction poses no obstacle to considering Plaintiffs' claim under the *Flores* Agreement. That is because the original *Flores* case itself—filed in the Central District of California–was premised on federal-question jurisdiction. The plaintiffs challenged, among other things, the conditions in which minor aliens were detained by the now-replaced Immigration and Naturalization Service (INS). *See Flores v. Lynch*, 828 F.3d 898, 901 (9th Cir. 2016); *Flores by Galvez-Maldonado v. Meese*, 942 F.2d 1352, 1357 (9th Cir. 1991), *rev'd on other grounds sub nom. Reno v. Flores*, 507 U.S. 292, 315 (1993) (rejecting facial challenge to regulation but not questioning subject matter jurisdiction). Another way to think about this is that no one questions the adjudicative authority—that is, the subject matter jurisdiction—of the District Court overseeing the consent decree to decide claims under it. Subject matter

jurisdiction does not vary from federal District Court to District Court, so it is as secure here as it is in the Central District of California.

The real question is whether the *Flores* Agreement permits *this* District Court—or, for that matter, any other District Court aside from the District Court overseeing the consent decree—to decide individual claims under the Agreement. Typically, a consent decree is enforced by the District Court before which the decree was entered. *See Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO v. City of Cleveland*, 478 U.S. 501, 523 n.13 (1986). But the *Flores* Agreement is atypical: the parties specifically provided that "a minor who disagrees with the INS's determination to place that minor in a particular type of facility … may seek judicial review in any United States District Court with jurisdiction and venue over the matter to challenge that placement determination ... ." *Flores* Agreement ¶ 24(B). In effect, Paragraph 24(B) acts as a choice-of-forum clause, allowing District Courts around the Nation to consider individual challenges to the government's placement determination (so long as venue is proper under 28 U.S.C. § 1391).[8]

## 2. Parental Release

Before addressing Plaintiffs' claim for simultaneous release of their fathers, the government makes the threshold argument that Paragraph 24(B) of the *Flores* Agreement does not provide for judicial review in this forum of even a *child*'s claim

---

[8]Sovereign immunity is not an obstacle to a claim under the *Flores* Agreement. By entering into the agreement and expressly consenting to suits challenging placement determinations, the government waived sovereign immunity. What's more, a final placement determination also may be challenged under the Administrative Procedure Act's waiver of sovereign immunity. 5 U.S.C. § 702; *see* Gov't Resp. Br. at 16 (acknowledging "that claims under Paragraph 24.B of the Agreement may be permitted under the APA").

for release, let alone a parent's. The government offers a reasonable argument, though it is ultimately flawed. Specifically, the government points out that Paragraph 24(B) allows for judicial review when a minor "disagrees with the INS's determination to place that minor in a *particular type of facility* … ." *Flores* Agreement ¶ 24(B) (emphasis added). To the government's way of thinking, the determination that is subject to review is only as to the *type* of facility, not as to whether release to a parent is required. Gov't Resp. Br. at 17-18. Under this interpretation, for example, a child can challenge placement in a State or county juvenile detention facility and instead seek to be transferred to a licensed program—but cannot challenge the refusal to release the minor from INS (now ORR) custody in the first place.

But this reading is too narrow. First, context is crucial in interpreting any contract. One of the exhibits to the *Flores* Agreement is a detailed set of instructions to immigration officers. *Flores* Agreement, Exh. 2, Instructions to Service Officers. Paragraph 24(B) is implemented by a specific instruction that treats challenges to a refusal to release in the same way as challenges to a refusal to be placed in a license program:

> **(j) Notice of right to bond redetermination and judicial review of placement.** A minor in deportation proceedings shall be afforded a bond redetermination hearing before an immigration judge in every case, unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing. A juvenile who is *not released or placed in a licensed placement* shall be provided (1) a written explanation of the right of judicial review as set out in Exhibit 6 of the *Flores v. Reno* Settlement Agreement, and (2) the list of free legal services providers compiled pursuant to INS regulations (unless previously given to the minor[)].

Instructions to Service Officers, ¶ (j) (emphasis added). The first sentence of Instruction Paragraph (j) addresses Paragraph 24(A)'s grant of a right to a bond redetermination hearing. The next sentence of Instruction Paragraph (j) thus implements the right of judicial review in Paragraph 24(B). The instruction specifically tells immigration officers to provide the judicial review notice for challenges to a refusal to release, and makes no mention that the Central District of California is the sole forum for that challenge. The parties to the *Flores* Agreement also presumably took practical considerations into account when crafting Paragraph 24(B). As a matter of judicial resources, it would make little sense to require *every* single individual detention challenge to be brought in the Central District of California. Indeed, because minors seeking release could be located in Districts all around the Nation, the most relevant sources of evidence—the minor and, usually, the pertinent government officials—would be located in those other Districts. Of course, judicial review of requests for *class*-based relief remains exclusively within the Central District of California's purview. But Paragraph 24(B) does authorize other Districts to consider a child's claim for release under the *Flores* Agreement.

On the merits, however, the *Flores* Agreement does not encompass a right to a *parent*'s release, at least on consideration of the issue at the preliminary-injunction stage. The Ninth Circuit so held in *Flores v. Lynch*, 828 F.3d 898, 908 (9th Cir. 2016), because nothing in the text of the *Flores* Agreement grants a right to parental release. "The Settlement does not explicitly provide any rights to adults. The fact that the Settlement grants class members a right to preferential release to a parent over

23

others does not mean that the government must also make a parent available; it simply means that, if available, a parent is the first choice." *Id.* (citing *Bunikyte, ex rel. Bunikiene v. Chertoff*, 2007 WL 1074070, at \*16 (W.D. Tex. Apr. 9, 2007)). Aside from the absence of textual support (which is enough to reject reliance on the Agreement), the history of the *Flores* litigation also dictates the interpretation: "In fact, the context of the *Flores* Settlement argues against this result: the Settlement was the product of litigation in which unaccompanied minors argued that release to adults other than their parents was preferable to remaining in custody until their parents could come get them." *Id.* (quoting *Bunikyte*, 2007 WL 1074070, at \*16). Minors, like Plaintiffs here, cannot adequately state a claim for parental relief based on the *Flores* Agreement.

To buttress the parental-release claim, Plaintiffs contend that the *Flores* Agreement can work in conjunction with a federal regulation, 8 C.F.R. § 1236.3(b)(2), to authorize federal courts to simultaneously release parents and their children. Pls.' Reply Br. at 6-8. Section 1236.3(b)(2) says that if no parent, legal guardian, or adult relative is available to take custody of the juvenile, and there is a such a person in immigration detention, then "simultaneous release of the juvenile and the parent, legal guardian, or adult relative shall be evaluated on a discretionary case-by-case basis." 8 C.F.R. § 1236.3(b)(2). But the problem with applying that sub-paragraph is that it only applies to "[j]uveniles for whom *bond* has been posted, for whom *parole* has been authorized, or who have been ordered released *on recognizance* … ." § 1236.3(b) (emphases added). None of these three possible prerequisites has been

24

met. No federal statute or regulation authorizes District Courts, in this immigration setting, to hold a "bond" hearing, to authorize "parole," or to order a release "on recognizance."[9]

The cases on which Plaintiffs rely do not support the conclusion that § 1236.3(b)(2) confers authority to District Courts to order a simultaneous release of parents. To be sure, the court in *Bunikyte* made remarks that might be read to suggest that the court was considering parental release, but in fact the court was merely observing that 8 C.F.R. § 236.3[10] reflected a preference of release to an adult relative not in custody over simultaneous release, and ultimately concluded that the *Flores* Agreement granted no additional rights to parents:

> This rule does not require simultaneous release and indeed appears to prefer release to an adult relative not in custody over simultaneous release of parent and child. …

---

[9]The government argues that the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) supersedes 8 C.F.R. § 1236.3, which was promulgated in 2002, because the TVPRA governs the release of minors who are in ORR custody. It is true that the TVPRA provides that placement determinations—including release from ORR custody—shall be made by the Secretary of Health and Human Services. 8 U.S.C. § 1232(c). But nothing in the TVPRA expressly overrides the *Flores* Agreement, including (for example) a minor's right to a bond hearing under Paragraph 24(A) of the Agreement. *Flores v. Sessions*, 862 F.3d 863, 876 (9th Cir. 2017) (holding that the TVPRA and the Homeland Security Act "specifically address ORR's responsibility for their care and placement while in government custody, but not the procedures for determining whether they should remain in such custody."). And it is debatable that W.S.R. and C.D.A. should be considered "unaccompanied alien" children, 6 U.S.C. § 279(g)(2), because it was the government that rendered them unaccompanied and their fathers are no longer in criminal detention. In any event, because the Court holds that 8 C.F.R. § 1236.3(b) is inapplicable, right now there is no need to decide whether the TVPRA has superseded that regulation.

[10]The text of 8 C.F.R. § 236.3 and § 1236.3 is identical. The only difference between the two is that § 236.3 is under Chapter I of the Federal Regulations title dealing with Aliens and Nationality (specifically, the Department of Homeland Security's immigration regulations), whereas § 1236.3 is under Chapter V of that title (specifically, the Justice Department's regulations governing the Executive Office of Immigration Review).

It therefore appears that nothing in this rule or in the terms of the *Flores* settlement would prevent release of the children to an adult relative not in ICE custody. This illustrates the fact that the *Flores* Settlement gives the minor Plaintiffs enforceable rights, but *does not create rights in the parents separate from their children's rights.*

*Bunikyte*, 2007 WL 1074070, at *16-17 (emphasis added). The court went on to conclude that "there appears to be no basis for a preliminary injunction ordering release of the Plaintiffs with their parents on these grounds." *Id.* at *17. So *Bunikyte* does not stand for the proposition that a District Court can order simultaneous release of a parent.

The other case cited by Plaintiffs, *United States v. Dominguez-Portillo*, 2018 WL 315759, at *16 (W.D. Tex. Jan. 5, 2018), is also distinguishable. In that case, the court addressed a claim to enforce the minor's right "to have immediate and ongoing *contact* with the family member who they were arrested with." *Id.* at *9 (emphasis added). Not surprisingly, the court held that the right to contact was "fundamentally inseparable from the corresponding right of that family member to have contact with the child."[11] *Id.* It went on to hold that "[t]his is easily distinguishable from the issue in *Bunikyte* in which parents sought release based on the *Flores* Settlement." *Id.* That is correct: a *parent*'s release is not "fundamentally inseparable" from the child's right to remain with his or her parent (which could be in detention) or, alternatively, to be

---

[11] *Ms. L. II* has already ordered that the government "must immediately take all steps necessary to facilitate regular communication between Class Members [parents] and their children who remain in ORR custody … ." *Ms. L. II*, 2018 WL 3129486, at *12.

26

housed in the least restrictive setting possible under the *Flores* Agreement (which could be without the parent).[12]

Nor do any of the cases cited by Plaintiffs stand for the proposition that the substantive due process to family integrity dictates *release* of the parents (as distinct from reunification). The governmental interest is expressed in the statutes governing mandatory detention for those seeking asylum at the stages of the process that Plaintiffs' fathers find themselves in. ███████████████ (C.D.A.'s father) has received a negative finding after his credible-fear interview, C.D.A. Mot. TRO at 3, and therefore is subject to mandatory detention, 8 U.S.C. § 1225(b)(1)(B)(iii)(IV).[13] ████████ has not yet had his credible-fear interview, but he is also subject to detention while awaiting his credible fear interview. 8 C.F.R. § 235.3(b)(4)(ii) ("Pending the credible fear determination by an asylum officer and any review of that determination by an immigration judge, the alien shall be detained.").[14] So the fathers

---

[12]Nor is there any holding, or even reasoning, in *Reno v. Flores,* 507 U.S. 292, 295 (1993), that confers parental-release rights. That opinion simply observed that a readily available alternative to keeping a minor in detention is to release the family together. *Id.* at 295. But the Supreme Court did not create a parental right to release, let alone one that could be implemented by a District Court.

[13]There is a right to immigration-judge review of the asylum officer's negative finding "as expeditiously as possible, to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination" of no credible fear. 8 U.S.C. § 1225(b)(1)(B)(iii)(III); 8 C.F.R. § 1003.42(e). ██████████████████'s interview took place on or before June 29, 2018, so that determination might very well have been reviewed as of July 6, 2018, although delays are not uncommon.

[14]If the asylum officer or immigration judge determines that ████████ or ████ ████████ (during his immigration-judge review) has a credible fear of persecution, then expedited removal proceedings are vacated and they will be referred for removal proceedings before an immigration judge under 8 U.S.C. § 1229a; 8 C.F.R. § 208.30(f). At this stage, they still only may be released from detention through a grant of parole under narrowly prescribed circumstances, such as an "urgent humanitarian reason or significant public benefit." 8 U.S.C. § 1182(b)(5); 8 C.F.R. § 212.5(b).

may be released only if they are granted parole, which is a decision in the sole discretion of the Attorney General and can only be granted under narrowly prescribed circumstances, such as "urgent humanitarian reasons or significant public benefit[,]" 8 U.S.C. § 1182(d)(5)(A), or a medical emergency or a "legitimate law enforcement objective," 8 C.F.R. § 235.3(b)(2)(iii). What's more, an alien who is subject to expedited removal and who is seeking to establish a credible fear of persecution is not eligible for release on bond. 8 C.F.R. §§ 235.3(c), 1003.19(h)(2)(i)(B). To accept Plaintiffs' argument that substantive due process requires release of the fathers would amount to deeming the mandatory detention statutes unconstitutional as applied. There is simply no case law support for recognizing that right.[15]

It is worth noting that, practically speaking, the reunification ordered by *Ms. L. II* will result in the release of many parents with their children. The government recognizes that it does not have enough "family residential centers" to maintain all of the *Ms. L.* class-action parents and their children in detention, and will end up releasing many of them together. *See* Gov't Resp. Br. at 19. So it still might be that the fathers of W.S.R. and C.D.A. will be released with their sons.

---

[15]In the immigration-judge decisions submitted by Plaintiffs after the hearing, the judges held that they have authority to conditionally parole both a minor and the parent under 8 U.S.C. § 1226(a)(2)(B), which does provide that "the Attorney General … may release the alien [who is subject to removal proceedings] on … conditional parole." The judges also held a bond hearing for each minor under Paragraph 24(A) of the *Flores* Agreement, and then invoked 8 C.F.R. § 1236.3(b)(2) (because bond had been granted) to simultaneously release the parents and the children. *See* R. 33, A 208-674-193 at 5-6 (Aug. 16, 2017). But as explained earlier, this Court has no like authority to conditionally parole an adult alien in expedited removal proceedings, nor like authority to hold a bond hearing for the minors.

## C. Consolidation of Immigration Proceedings

The other forms of relief that Plaintiffs request are directed at the immigration proceedings that they and their fathers are undergoing. Specifically, Plaintiffs wish to protect their right to seek asylum "by consolidating Plaintiffs' immigration cases with their parents in the Chicago Immigration Court, as well as the ability to participate in the removal process with their parents as witnesses," and if "Plaintiffs and their fathers are not released from custody, requiring DHS and ICE to make Plaintiffs and their fathers available as witnesses for additional proceedings in these cases, as appropriate." Pls.' Reply Br. at 19.

Plaintiffs rely on procedural due process as the basis for the immigration-proceedings relief.[16] When determining what process is "due," a court must balance the familiar factors: "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Schepers v. Comm'r, Indiana Dep't of Correction*, 691 F.3d 909, 915 (7th Cir. 2012) (quoting *Mathews v. Eldridge,* 424 U.S.

---

[16]Plaintiffs' original motions for a temporary restraining order do not explicitly state the legal basis for the immigration-proceedings relief, and contain minimal argument in support of it. Perhaps reflecting the absence of detailed argument in the opening motions, the government's response does not address the requested relief. Plaintiffs' reply brief more explicitly states that procedural due process is the premise of the claim. Pls.' Reply Br. at 10-11. If it appeared that relief might be warranted, then the Court would have allowed the government to file a sur-reply. But because Plaintiffs are not likely to succeed on the claim, further briefing is not necessary.

319, 335 (1976)). Plaintiffs assert that their interest is in maintaining family integrity and preserving their "asylum seeking rights." Pls.' Reply Br. at 11.

To be sure, those are important interests, but *any* preliminary injunction is an "extraordinary remedy," *Winter,* 555 U.S. at 22, and indeed the requested relief is, as far as the Court can tell, unprecedented. For the judiciary to order the consolidation of immigration proceedings, specify the location of the hearings, and dictate who must be available as witnesses would full-force intrude on the Executive Branch's system of handling asylum requests, a system designed in large part by Congress. What's more, the accelerated reunification order will effectively grant some of the relief requested by Plaintiffs, at least as to the pursuit of the asylum claims together. On the current record, the immigration proceedings must be allowed to play out without interference from the Court.

### D. Removal of Fathers without Plaintiffs

On June 29, 2018, the Court ordered that "Defendants and their officers, agents, servants, employees, attorneys, and all those who are in active concert or participation with them, are preliminarily enjoined from removing from the United States either ████████████████ without W.S.R. or ████████████████████ without C.D.A." 6/29/18 Order at 2. At that point, the government had not articulated a legitimate interest in removing the fathers from the country without their sons. *Id.* That remains true to this day, and the government did not move to dissolve this relief. No other circumstances have arisen that would warrant a vacatur of that order, so it remains in place.

## IV. Conclusion

For the reasons discussed above, the Court grants the following relief:

1.     The government must reunite C.D.A. with his father, ███████████ ███████████, within 72 hours of the posting of this order on the docket.[17]

2.     The government must reunite W.S.R. with his father, ███████████ ████, within 72 hours of the posting of this order on the docket.

3.     The government must continue to comply with the order of June 29, 2018. Specifically, Defendants and their officers, agents, servants, employees, attorneys and all those who are in active concert or participation with them are preliminarily enjoined from removing from the United States either ████ ████████████ without W.S.R. or ████████████████████ without C.D.A.

The other preliminary relief requested by Plaintiffs is denied. The status hearing of July 11, 2018, remains as scheduled.[18]

ENTERED:

_____s/Edmond E. Chang_____
Honorable Edmond E. Chang
United States District Judge

DATE: July 9, 2018

---

[17]The Court's staff will endeavor to reach at least one counsel of record for both sides by phone immediately after the posting of this Opinion.

[18]For now, this Opinion is being uploaded as a restricted document, which limits its remote access (though the Opinion is still public). But it appears that Federal Rule of Civil Procedure 5.2(c)(2)(B) requires orders and opinions, even in immigration cases, to be accessible remotely. If either party wishes to maintain the document as restricted, then the request should be made at the status hearing (the Court would then give the requesting party some time to file a concise brief on the issue).