**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| W.S.R., a minor,<br><br>        Plaintiff,<br><br>v.<br><br>JEFFERSON B. SESSIONS III, Attorney General of the United States, *et al.*<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civ. No. 18-cv-4291, consolidated with Civ. No. 18-cv-4265

Hon. Judge Edmond E. Chang

**SECOND AMENDED COMPLAINT FOR DECLARATORY RELIEF**

| | |
|---|---|
| C.D.A., a minor,<br><br>        Plaintiff,<br><br>v.<br><br>JEFFERSON B. SESSIONS III, Attorney General of the United States, *et al.*<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## INTRODUCTION

1.    This case challenges the United States' decisions to forcibly separate a then 15-year-old boy, W.S.R., and his father, and a 9-year old boy, C.D.A., and his father[1], shortly after the families crossed the United States-Mexico border in May 2018 seeking asylum. These separations violated, among other things, each child's constitutional rights and the special protections afforded to minors in the custody of United States immigration authorities.

2.    This is an individual action on behalf of each child arising from Paragraph 24B of the Flores Settlement Agreement (hereinafter "FSA"), in *Flores v. Sessions*, CV-85-4544 (C.D.

---

[1] W.S.R. turned 16 while separated from his father in the custody of the U.S. government. The families are unrelated.

Cal.). The FSA gives the Plaintiffs W.S.R. and C.D.A., minor children, the right to challenge the improper and unlawful decision of the Department of Homeland Security ("DHS") to separate the children from their fathers and place them in the custody of the Office of Refugee Resettlement ("ORR") at a facility operated by Heartland Human Care Services, Inc. in Chicago. Despite seeking protection together as a family unit at the southern United States border, DHS wrongfully separated each child from his father for more than 45 days.

3.      W.S.R. and C.D.A. were separated from their fathers—without any consideration given to the irreparable psychological and physical damage that separation causes to children—because Defendants wanted to punish asylum-seekers and deter them from lawfully pursuing refuge in the United States. There was, at no time, any assertion of abuse, neglect, or parental unfitness, nor were any hearings or process conducted of any kind by the government before the decision to separate.

4.      W.S.R. and C.D.A. challenged the decision to separate them from their fathers and petitioned this Court to review their placements under (i) the Due Process Clause of the Fifth Amendment, and (ii) paragraph 24B of the Flores Settlement Agreement, which permits any child to challenge the government's improper placement decision in a federal district court with jurisdiction and venue.

5.      Since 1997, the FSA has provided that all minors in immigration custody shall be treated with "dignity, respect and special concern for their particular vulnerability as minors." DHS's arbitrary and unlawful decision to separate W.S.R. and C.D.A., minor children, from their fathers violated the FSA under various provisions outlined below.

6.     In addition, DHS's decision to separate parent and child violates the Due Process Clause of the Fifth Amendment which does not allow the United States government to forcibly separate asylum-seeking families, parents and their children, without any justification or hearing.

7.     As fully described below, W.S.R. and C.D.A. seek a declaration that the unlawful separation from their fathers violated the FSA and violated their Constitutional right to due process.  They also seek a permanent injunction prohibiting them from being separated from their fathers by the United States government, and request a U visa certification signed by this Court.

## JURISDICTION

8.     This case arises under the FSA, a consent decree to which the United States is a party, and W.S.R. and C.D.A. were protected class members until their respective releases from immigration detention.[2]

9.     This Court has jurisdiction pursuant to ¶ 24(B) of the Flores Agreement; 28 U.S.C. § 1331 (federal question jurisdiction with a waiver of sovereign immunity pursuant to the Administrative Procedure Act, 5 U.S.C. §701 et seq.); 28 U.S.C. § 2241 (habeas jurisdiction); 28 U.S.C. § 1346 (United States as defendant); and Art. I, § 9, cl. 2 of the United States Constitution ("Suspension Clause"). Jurisdiction lies to grant declaratory relief pursuant to 28 U.S.C. §§ 2201-2202 (Declaratory Judgment Act).

10.     Plaintiffs were in custody for purposes of habeas jurisdiction.

---

[2] W.S.R. was released from immigration detention with his father on the day of reunification, July 12, 2018. C.D.A. and his father were reunited in immigration detention on July 12, 2018, and were transferred together to the Berks Family Residential Center, a family detention facility. They were released from detention on October 9, 2018. Both families now reside in the Boston, Massachusetts area.

## VENUE

11.     Plaintiffs-Petitioners W.S.R. and C.D.A. were detained at a Heartland Human Care Services, Inc.'s shelter for unaccompanied alien children in ORR custody in Chicago, Illinois from May 27, 2018 through July 12, 2018. On July 12, 2018, they were released for reunification because this Honorable Court entered an order granting preliminary injunctive relief that required reunification occur by that date.

12.     Venue in the Northern District of Illinois is proper under 28 U.S.C. § 1391(e) and Paragraph 24B of the FSA.

## PARTIES

13.     Plaintiff-Petitioner W.S.R. is a 16-year-old minor child, native and citizen of Brazil. This action is brought on his behalf, under the authority of his father Mr. C.A.R. Mr. C.A.R. is also a native and citizen of Brazil. Together, they fled Brazil seeking protection from persecution they suffered and fear they will continue to suffer if they are forced to return to Brazil. They came to the United States border to lawfully seek asylum together as a family.

14.     Plaintiff-Petitioner C.D.A. is a 9-year old minor child, native and citizen of Brazil. This action is brought on his behalf, under the authority of his father Mr. C.A.D.P.O. Mr. C.A.D.P.O. is also a native and citizen of Brazil. Together, they fled Brazil and came to the United States, and fear they will be harmed if they are forced to return to Brazil. They came to the United States border to lawfully seek asylum together as a family.

15.     Defendant-Respondent Jefferson B. Sessions III is the Attorney General of the United States and the head of the United States Department of Justice ("DOJ"). The DOJ is the federal agency responsible for enacting a nationwide policy of family separation and approving and recommending separation as it related to each family. Defendant-Respondent Sessions

shares responsibility, along with the Secretary of Homeland Security, for administering and enforcing the immigration laws. He is an architect of his administration's family separation policy that resulted in W.S.R. and C.D.A. being separated from their fathers. He is sued in his official capacity.[3]

16.     Defendant-Respondent Kirstjen M. Nielsen is the Secretary of Homeland Security and the head of DHS, the federal agency responsible for enforcing the immigration laws of the United States. Defendant-Respondent Nielsen has ultimate responsibility for administering and enforcing the immigration laws. She is an architect of her administration's family separation policy that resulted in W.S.R. and C.D.A. being separated from their fathers. She is sued in her official capacity.

17.     Defendant-Respondent Ronald D. Vitiello is the Acting Director of U.S. Immigration and Customs Enforcement ("ICE"), the agency within DHS that is responsible for carrying out removal orders and oversees enforcement and removal operations throughout the United States. In that capacity, Defendant-Respondent Vitiello has direct authority over all ICE policies, procedures and practices relating to the detention and deportation of noncitizens. He is sued in his official capacity.

18.     Defendant-Respondent Kevin K. McAleenan is the Commissioner of U.S. Customs and Border Protection ("CBP"), the agency within DHS that is responsible for the initial processing and detention of noncitizens apprehended near the United States Border. In that capacity, Defendant-Respondent McAleenan has direct authority over all CBP policies,

---

[3] Plaintiffs are precluded by from filing *Bivens* claims against the individual government officials responsible for this unlawful government policy by the Supreme Court precedent set in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017).

procedures and practices relating to apprehending asylum seekers and CBP decisions to separate families. He is sued in his in official capacity.

19.     Defendant-Respondent Alex M. Azar II is the Secretary of the U.S. Department of Health and Human Services ("HHS"), the Department of the Executive Branch of the United States government that oversees the division and office responsible for the care and custody of minors detained without their parents. Defendant-Respondent Azar is the head of HHS, and has ultimate responsibility for the physical care and daily detention of minors in the custody of immigration authorities without their parents. He is sued in his official capacity.

20.     Defendant-Respondent E. Scott Lloyd is the Director of the ORR, the office within the Administration for Children and Families (a division of HHS) that is responsible for providing care and placement for children detained by the United States government without their parents. In that capacity, Defendant-Respondent Lloyd has direct authority over all ORR policies, procedures and practices relating to the physical care and daily detention of minors detained without parents in ORR facilities. He is sued in his official capacity.

21.     Defendant-Respondent Ricardo Wong is the Director of the ICE Field Office for Enforcement and Removal Operations in Chicago, Illinois. He exercises authority over ICE activities in the Illinois region. He is sued in his official capacity.

22.     Defendant-Respondent Margaret Hartnett is the Director of the ICE Field Office for Enforcement and Removal Operations in West Texas. She exercises authority over ICE activities in the west Texas and New Mexico region. She is sued in her official capacity.

## FACTS

23.     Plaintiff-Petitioner, W.S.R., is a citizen of Brazil and is now 16 years old.

24.     Mr. C.A.R. is the father of W.S.R.

25.     Father and son were apprehended at the southern border of the United States. Mr. C.A.R. has asserted a fear of return to Brazil, and W.S.R. is a derivative on his father's asylum application. They are legitimate and lawful asylum seekers.

26.     Before fleeing Brazil W.S.R. and his father lived together as a family. They have always lived together as father and son.

27.     W.S.R. has always relied on the care and love of his father.

28.     Plaintiff-Petitioner C.D.A. is a citizen of Brazil and is 9 years old.

29.     Mr. C.A.D.P.O. is the father of C.D.A.

30.     Father and son were apprehended at the southern border of the United States. Mr. C.A.D.P.O. has asserted a fear of return to Brazil, and C.D.A. is a derivative on his father's asylum application. They are legitimate and lawful asylum seekers.

31.     Before fleeing Brazil, C.D.A. and his father lived together as a family. They have always lived together as father and son.

32.     C.D.A. has always relied on the care and love of his father.

**Fear of Persecution and Pending Immigration Proceedings**

33.     For the five months before entering the United States, W.S.R. and his father lived together in Brazil, and fled because they received death threats from a drug trafficker who lived in their neighborhood.

34.     W.S.R. and his father attempted to relocate within Brazil, but still feared for their lives. W.S.R.'s father feared seeking police protection because of allegedly rampant corruption in the Brazilian police force. W.S.R.'s father attests that they cannot evade the drug trafficking network anywhere in Brazil, and if they return to Brazil, they will be killed.

35.     C.D.A.'s father, Mr. C.A.D.P.O. borrowed $8,000 to travel to the United States with C.D.A. from a loan shark who belongs to a large criminal organization of human and drug traffickers,

36.     As a teenager, Mr. C.A.D.P.O. had refused to join the operation and the drug traffickers attacked him and burned him with a hot knife. Mr. C.A.D.P.O. believes that if he and C.D.A. return to Brazil, they will be forced into indentured servitude or killed.

### Entry Into the U.S. and Separation

37.     On May 7, 2018, Defendants-Respondents implemented the so-called "zero tolerance" policy of prosecuting parents with illegal entry and separating them from their children. The stated goal of this policy was to deter migrant parents who enter the United States without authorization accompanied by their children. These statements make clear that family separation is not a collateral consequence of regular law enforcement under this policy; rather, it is an explicit, intentional goal.

38.     On approximately May 23, 2018, W.S.R. and Mr. C.A.R. came to the United States and attempted to enter at a Port of Entry to seek asylum.  They were told the Port of Entry was "closed."

39.     On approximately May 23, 2018, Defendants-Respondents took W.S.R. and his father into custody near the United States-Mexico border.

40.     After being held two days in a border facility, during which time Mr. C.A.R. and W.S.R. were not able to sleep, Defendants-Respondents came in the night, told the family that they were taking W.S.R. to a separate location "for two or three days, five at most," and that afterwards both would be deported. W.S.R. began crying and to calm him, Mr. C.A.R. promised him that they would be together soon.

41.     Upon forcibly separating Mr. C.A.R. from his son, Defendants-Respondents did not inform Mr. C.A.R. of his son's whereabouts nor did they permit W.S.R. to speak with his father.

42.     W.S.R. was placed in ORR custody at a facility operated by Heartland Human Care Services, Inc. in Chicago, Illinois.

43.     Mr. C.A.R. was placed in U.S. Marshal custody and charged with "Illegal Entry Without Inspection" (8 U.S.C. § 1325), a misdemeanor. He was held in the custody of the U.S. Marshals for 12 days, and was sentenced to time served. Both W.S.R. and his father remain lawful asylum seekers despite this charge.

44.     Mr. C.A.R. was returned to Defendants-Respondents' custody on or about June 7, 2018. When W.S.R. initially filed this lawsuit, he had not spoken to his father and Mr. C.A.R. had not been told where his son was located. Even after Mr. C.A.R. discovered W.S.R.'s whereabouts, Mr. C.A.R. and W.S.R. experienced great difficulty in communicating. W.S.R. was not returned to his father's care until July 12, 2018 by order of this Honorable Court. Both Mr. C.A.R. and W.S.R. were released from immigration detention on July 12, 2018, and are participating in ongoing asylum proceedings in immigration court.

45.     When Mr. C.A.D.P.O. came to the United States with C.D.A. on approximately May 23, 2018, they attempted to enter at a Port of Entry to seek asylum, but were told the Port of Entry was "closed."

46.     On approximately May 23, 2018, Defendants-Respondents took C.D.A. and his father into custody near the United States-Mexico border.

47.     After being held two days in a border facility, an official named Victor Sandoval told Mr. C.A.D.P.O. and C.D.A. that they would be separated for a "process" lasting three-to-

five days, and afterwards they would be reunited. Officer Sandoval did not tell Mr. C.A.D.P.O. where he was taking C.D.A.

48.     Nine-year-old C.D.A. was upset but his father tried to calm him down, saying it would only be a few days and they would be together again. Mr. C.A.D.P.O. told his son he would not leave him.

49.     C.D.A. was sent to ORR custody at a facility operated by Heartland Human Care Services, Inc. in Chicago, Illinois. When C.D.A. initially filed this lawsuit, he had not spoken to or heard from his father in more than three weeks, and Mr. C.A.D.P.O. had not been told where his son was located.

50.     Mr. C.A.D.P.O. was placed in U.S. Marshal custody and charged with "Illegal Entry Without Inspection" (8 U.S.C. § 1325), a misdemeanor. He was held in the custody of the U.S. Marshals for about 12 days, and was sentenced to time served. Both C.D.A. and his father remain lawful asylum seekers despite this charge.

51.     Mr. C.A.D.P.O. was returned to Defendants-Respondents' custody on or about June 7, 2018. C.D.A. was not returned to his father's care until July 12, 2018 pursuant this Court's Order.  (7/9/18 Mem. Op. & Order ("Order").)

52.     C.D.A. experienced extreme psychological trauma and distress as a result of this experience. On or about July 2, 2018, Dr. Michelle Cutler, a clinical psychologist, interviewed and evaluated CDA.  She also reviewed Heartland Human, including daily monitoring logs, counseling notes, incident reports, and psychiatric records.  Dr. Cutler concluded that C.D.A. suffered from severe anxiety and depression as a result of the separation.  The deterioration of C.D.A.'s mental health was reflected in his thoughts of self-harm, acts of self-harm, and acts of harming others.

53.     Mr. C.A.D.P.O. and C.D.A. were reunited in detention and transferred to the Berks Family Residential Facility, a family detention facility in Reading, Pennsylvania, where they remained until their release on August 9, 2018. They are currently participating in ongoing immigration proceedings.

54.     Detention unnecessarily exposes children with high rates of previous trauma to additional psychological trauma, putting children like W.S.R. and C.D.A. at greater risk for physical and mental health problems.

55.     Separating families is detrimental to children's well-being, burdens the immigration court process, and increases costs to the government.

56.     Intentionally rendering children unaccompanied has negative consequences to the children and parents, as well as to the adjudication system. Separating a child from a parent is traumatic for both parties, and this practice has been proven to be detrimental to the well-being of children.

57.     Medical professionals, including the American Academy of Pediatrics, have condemned the practice of family separation, explaining that "[f]ear and stress, particularly prolonged exposure to serious stress without the buffering protection afforded by stable, responsible relationship . . . can harm the developing brain and harm short-and long-term health."[4]

### Legal Framework of the Flores Settlement Agreement

58.     On January 28, 1997, a class-wide settlement agreement, the FSA, was reached in a case that is presently captioned *Flores v. Sessions*, CV-85-4544 (C.D. Cal.). The settlement was the result of a class action filed on behalf of minor children who had been detained by the

---

[4]  Letter from Colleen A. Kraft, MD, FAAP, President of the American Academy of Pediatrics, March 1, 2018, available at https://downloads.aap.org/DOFA/AAP%20Letter%20to%20DHS%20Secretary%2003-01-18.pdf

former Immigration and Naturalization Services ("INS"). The children challenged, among other things, the procedures regarding the detention, release, and treatment of minor children. According to the stipulation between the parties to the FSA, the terms of the FSA are in effect and remain in effect until the 45th day "following defendants' publication of final regulations implementing" the FSA. Regulations have never been published. *See* FSA, attached hereto as Exhibit A.

59.     The FSA applies to "[a]ll minors who are detained in the legal custody of the INS." FSA, ¶ 10. A "minor" is "any person under the age of eighteen (18) years who is detained in the legal custody of the INS." *Id.*, ¶ 4.

60.     The FSA "sets out nationwide policy for the detention, release, and treatment of minors in the custody of the INS[.]" *Id.*, ¶ 9. The immigration authorities must treat "all minors in its custody with dignity, respect and special concern for their particular vulnerability as minors." *Id.*, ¶ 11.

61.     Each Defendant-Respondent must comply with the FSA. W.S.R. and C.D.A. were class members of the FSA as minors detained in the legal custody of DHS,[5] which has replaced INS.

62.     The FSA applies to all minors in immigration custody, regardless of whether the child is apprehended unaccompanied by his parent or accompanying his parent. *See Flores v. Lynch*, 828 F.3d 898, 905-6 (9th Cir. 2016).

**Paragraph 11 Protections:**

63.     Paragraph 11 of the FSA requires that "[t]he INS treats, and shall continue to treat, all minors in its custody with dignity, respect and special concern for their particular vulnerability as minors. The INS shall place each detained minor in the least restrictive setting

---

[5] INS ceased to exist on March 1, 2003, when it was replaced by the newly created DHS.

appropriate to the minor's age and special needs, provided that such setting is consistent with its interests to ensure the minor's timely appearance before the INS and the immigration courts and to protect the minor's well-being and that of others." FSA, ¶11.

64.     Family separation fails to take into account the dignity, respect and special concern for minors. A separated child is not placed in the least restrictive setting. *See Reno v. Flores* 507 U.S. 292 (1993). "The parties to the present suit agree that the Service must assure itself that someone will care for those minors pending resolution of their deportation proceedings. That is easily done when the juvenile's parents have also been detained and the family can be released together …." *Id.* at 295.

65.     The FSA and resulting litigation further contemplates instances where detention of the minor (and accompanying family) is necessary or mandated by law and outlines the requirements for detention or applicable discretion in those instances. At no point does the FSA require or call for the immediate separation of a child from a parent without regard to available alternatives or justification.

**Paragraph 12 Protections:**

66.     Paragraph 12 of the FSA requires "Whenever the INS takes a minor into custody, it shall expeditiously process the minor and shall provide the minor with a notice of rights, including the right to a bond redetermination hearing if applicable. Following arrest, the INS shall hold minors in facilities that are safe and sanitary and that are consistent with the INS's concern for the particular vulnerability of minors. Facilities will provide access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to

13

protect minors from others**, and contact with family members who were arrested with the minor**." FSA, ¶12 (emphasis added).

67.     Accordingly, Defendants-Respondents were required to facilitate contact with family members arrested with W.S.R. and C.D.A. They failed to do so until W.S.R. and C.D.A. filed their initial lawsuit.

**Paragraph 14 Protections:**

68.     The FSA provides Defendants with four options respecting the custody of a class member, in the following order of preference: (1) a Paragraph 14 release from DHS custody; (2) a Paragraph 19 temporary placement in a licensed program; (3) a Paragraph 21 secure placement; or, (4) a brief Paragraph 12 placement in an INS detention center when immediate release or placement is not possible. FSA, ¶¶12, 14, 19 and 21.

69.     At all times, Defendants must seek and work to release a minor. "Where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others, the INS shall release a minor from its custody without unnecessary delay[.]" *Id.* ¶ 14.

70.     Under the FSA, the release of the class member to his or her parent is the primary objective. *Id.* ¶ 14. Family unity is always the preferred option. *Id.*

71.     Paragraph 14 of the FSA requires:

Where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others, the INS shall release a minor from its custody without unnecessary delay, in the following order of preference, to:
    a)      a parent;
    b)      a legal guardian;
    c)      an adult relative (brother, sister, aunt, uncle, or grandparent);
    d)      an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being in (i) a declaration signed under penalty of perjury before an

immigration or consular officer or (ii) such other document(s) that establish(es) to the satisfaction of the INS, in its discretion, the affiant's paternity or guardianship;

e)     a licensed program willing to accept legal custody; or

f)     an adult individual or entity seeking custody, in the discretion of the INS, when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility. FSA, ¶14.

**Paragraph 24B Protections:**

72.     The Flores Agreement authorizes class members to challenge the placement and custodial decision regarding the minor in "any United States District Court with jurisdiction and venue over the matter to challenge that placement determination or to allege noncompliance with the standards set forth in Exhibit 1." See *id.* ¶ 24B of the FSA.

73.     The standard of review for placement decisions is "de novo." *See* ¶ 24C of the FSA.

74.     W.S.R. and C.D.A. contested the decision of Defendants-Respondents to forcibly separate them from their fathers without cause.

**Paragraph 36 Protections:**

75.     The FSA also provides a reservation of rights provision which permits a class member to exercise any "independent rights" he may have as contemplated by the settlement. *See* ¶ 36 of the FSA: "Nothing in this agreement shall limit the rights, if any, of individual class members to preserve issues for judicial review in the appeal of an individual case or for class members to exercise any independent rights they may otherwise have."

76.     W.S.R. and C.D.A.'s fundamental rights to family integrity were violated when Defendants-Respondents forcibly separated them from their fathers.

77.     In forcibly separating W.S.R. and C.D.A. from their fathers, Defendants-Respondents violated their independent rights under the FSA and the Due Process Clause of the Fifth Amendment.

78.     W.S.R. and C.D.A., minor children, have a fundamental right to family integrity under the Due Process Clause of the Fifth Amendment to remain together with their fathers.

## CLAIMS

### COUNT I

### Violation of Substantive Due Process

79.     All of the foregoing allegations are repeated and re-alleged as though fully set forth herein.

80.     The Due Process Clause of the Fifth Amendment applies to all "persons" on United States soil, and thus applies to W.S.R. and C.D.A.

81.     W.S.R. and C.D.A. have a liberty interest under the Due Process Clause in remaining in the custody of their parents.  This liberty interest encompasses "a child's right to reunify with his parent in immigration custody, after the parent's criminal detention ends and absent parental unfitness or danger to the child." (Mem. Op. & Order at 12.)

82.     The Government directly and substantially interfered with W.S.R. and C.D.A's right to reunification. Among other things, the Government forcibly separated W.S.R. and C.D.A. from their respective fathers and placed the boys in a facility almost 1,000 miles away from their fathers.

83.     The Government's separation of W.S.R. and C.D.A. from their fathers violates substantive due process because it serves no legitimate governmental objective, and is arbitrary and conscience shocking.

16

84.     An actual controversy exists between Plaintiffs W.S.R. and C.D.A. and Defendants with respect to the actions of Defendants in separating them from their parents in violation of their Substantive Due Process Rights under the Fifth Amendment to the United States Constitution.

85.     The actual controversy between Plaintiffs W.S.R. and C.D.A. and Defendants involves the question of whether Defendants violated W.S.R and C.D.A.'s substantive due process rights as outlined in the Fifth Amendment to the United States Constitution when Defendants separated them from their fathers because such separation serves no legitimate governmental objective and is arbitrary and shocks the conscience.

86.     Plaintiffs file the instant Second Amended Complaint for the purpose of obtaining a declaratory judgment finding that Defendants violated Plaintiffs W.S.R. and C.D.A's substantive due process rights by separating them from their parents soon after they crossed into the United States from Mexico.

Wherefore, Plaintiffs W.S.R. and C.D.A respectfully request that this Court enter a Judgment against Defendant-Respondents Jefferson B. Sessions III in his capacity as the Attorney General of the United States, Kirstjen M. Nielsen in her capacity as the Secretary of Homeland Security, Kevin K. McAleenan in his capacity as Commissioner of U.S. Customs and Border Protection, Alex M. Azar II in his capacity as the Secretary of the U.S. Department of Health and Human Services, E. Scott Lloyd in his capacity as the Director of the Office of Refugee Resettlement, Ronald D. Vitiello in his capacity as the Acting Director of U.S. Immigration and Customs Enforcement, Ricardo Wong in his capacity as Director of the Immigration and Customs Enforcement Field Office for Enforcement and Removal Operations in Chicago, Illinois, and Margaret Hartnett in her capacity as the Director of the Immigration and

Customs Enforcement Field Office for Enforcement and Removal Operations in West Texas as follows:

A.    For a Judgment in favor of Plaintiffs W.S.R. and C.D.A and against Defendants for an amount to be proven at trial;

B.    For a Declaratory Judgment finding that Defendants violated the substantive due process rights of the Plaintiffs by separating Plaintiffs from their fathers and refusing to reunite Plaintiffs with their fathers;

C.    For a permanent injunction against the Defendants to prohibit them from removing from the United States either Mr. C.A.R. without W.S.R. or Mr. C.A.D.P.O without C.D.A.;

D.    For all attorneys' fees and costs associated with bringing this action; and

E.    For any other relief this Court deems appropriate under the circumstances.

**Count II**

**Violation of the Flores Agreement –
Failure to Work Toward Release Under Paragraph 14**

87.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

88.    On June 18, 2018 and June 19, 2018, counsel for the Plaintiffs contacted the Office of the U.S. Attorney in Chicago by telephone and facsimile, and provided notice of FSA violations with regard to W.S.R. and C.D.A., respectively, as required by Paragraph 37 of the FSA, copying the Center for Constitutional Law, the National Center for Youth Law, the Office of the U.S. Attorney for the Central District of California, and the Office of Immigration Litigation at the Department of Justice.

89.    On June 19, 2018, counsel spoke via telephone with Sarah B. Fabian, a Senior Litigator with the DOJ's Office of Immigration Litigation, who confirmed the Plaintiffs' compliance with this FSA requirement on behalf of the government.

18

90.     Forcibly separating W.S.R. and C.D.A. from their accompanying fathers upon apprehension violates the FSA, which requires placement with a parent in the first instance.

91.     Before multiple court orders by various courts, including this Honorable Court, Defendants-Respondents made no attempt to reunify W.S.R. or C.D.A. with their fathers, as required under the FSA. Nor did Defendants-Respondents engage in any individualized custody determinations concerning W.S.R. or C.D.A. with regards to family unity. Rather, Defendants-Respondents willfully violated their legal obligations under the FSA by forcibly separating the children from their parents as a matter of policy and without cause.

92.     An actual controversy exists between Plaintiffs W.S.R. and C.D.A. and Defendants with respect to the actions of Defendants in separating Plaintiffs from their parents in violation of the Flores Settlement Agreement.

93.     The actual controversy between Plaintiffs W.S.R. and C.D.A.  and Defendants involves the question of whether Defendants violated W.S.R and C.D.A.'s rights under the Flores Settlement Agreement when Defendants separated Plaintiffs from their fathers as a matter of policy and without cause.

94.     Plaintiffs file the instant Second Amended Complaint for the purpose of obtaining a declaratory judgment finding that Defendants violated Plaintiffs W.S.R. and C.D.A.'s rights under the Flores Settlement Agreement by separating them from their parents and then failing to work toward reunification and release as required by Paragraph 14 of the FSA.

Wherefore, Plaintiffs W.S.R. and C.D.A respectfully request that this Court enter a Judgment against Defendant-Respondents Jefferson B. Sessions III in his capacity as the Attorney General of the United States, Kirstjen M. Nielsen in her capacity as the Secretary of Homeland Security, Kevin K. McAleenan in his capacity as Commissioner of U.S. Customs and

Border Protection, Alex M. Azar II in his capacity as the Secretary of the U.S. Department of Health and Human Services, E. Scott Lloyd in his capacity as the Director of the Office of Refugee Resettlement, Ronald D. Vitiello in his capacity as the Acting Director of U.S. Immigration and Customs Enforcement, Ricardo Wong in his capacity as Director of the Immigration and Customs Enforcement Field Office for Enforcement and Removal Operations in Chicago, Illinois, and Margaret Hartnett in her capacity as the Director of the Immigration and Customs Enforcement Field Office for Enforcement and Removal Operations in West Texas as follows:

A.      For a Declaratory Judgment finding that Defendants violated Plaintiffs rights under the Flores Settlement Agreement by separating Plaintiffs from their fathers and failing to work toward reunification and release as required by Paragraph 14;

B.      For all attorneys' fees and costs associated with bringing this action; and

C.      For any other relief this Court deems appropriate under the circumstances.

## Count III

### Violation of the Flores Agreement – Paragraph 24(b) Violation

95.      All of the foregoing allegations are repeated and realleged as though fully set forth herein.

96.      Defendants-Respondents' separation of children from their parents constitutes an intentional interference with parental rights. Enforcement actions cannot be used as justification to effect intentional family separation.[6]

---

[6] In *Aguilar v. U.S. Immig. and Customs Enforcement*, 501 F.3d 1 (1st Cir. 2007), the U.S. Court of Appeals for the First Circuit explained that a violation of the right to family integrity could be found in government conduct that intended to interfere with rights to family integrity in some way. Indeed, the First Circuit went so far as to state that "it is easy to imagine how viable claims might lie" if by government action "a substantial number of young children [were] knowingly placed in harm's way." In a recent decision in the Southern District of California, a federal judge relied on exactly that statement to

97.     The Flores Settlement Agreement permits a child to contest the placement decision of Defendants-Respondents. W.S.R. and C.D.A. asserted this right and alleged that their placement nearly 1,000 miles away from their accompanying parents at a facility for unaccompanied minors was improper.

98.     The United States Supreme Court has on numerous occasions reaffirmed this right.[7]

99.     In 1993, Justice Scalia in *Reno v. Flores* (507 U.S. 292) explained that ensuring that minors will be cared for during the pendency of removal proceedings is "easily done when the juvenile's parents have also been detained and the family can be released together."

100.     In addition, state laws provide both substantive and procedural protections of the rights of parents to care for their children, and of children to be with their parents, such that children may only be separated from their parents as a matter of last resort.

101.     The Flores Agreement requires the federal government to place children in custody in the least restrictive setting that is in the best interests of the child, and to grant

---

identify a constitutional concern with the way the government's family separation policy is playing out on the border today. *Ms. L. v. ICE*, No. 18-cv-0428 (June 6, 2018).

[7] *See Santosky v. Kramer*, 455 U.S. 745, 753-54 & n.7 (1982) (recognizing not just the "fundamental liberty interest of natural parents in the care, custody and management of their child" but also "the important liberty interests of the child"); *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected.") (citations omitted). In *Troxel v. Granville*, the Supreme Court cited nearly 80 years of precedent and described parents' rights "in the care, custody, and control of their children" to be "perhaps the oldest of the fundamental liberty interests recognized by this Court." 530 U.S. 57, 66 (2000). The Court has explained that government action may only intentionally infringe on this liberty interest when necessary for the child's welfare interest and safety. Even in those circumstances, government action is limited, and the parent is constitutionally entitled to a hearing on his or her fitness before their child is taken from their custody. *Stanley v. Illinois*, 405 U.S. 645 (1972). These federal constitutional rights and protections have been applied equally to immigrant and citizen parents in child welfare cases. *See, e.g., In re Doe*, 281 P.3d 95 (Idaho 2012); *In re E.N.C.*, 384 S.W.3d 796 (Tex. 2010); and *In re Interest of Angelica L.*, 767 N.W.2d 74 (Neb. 2009).

preference to parents—without regard to the parents' immigration status—above all other forms of release.

102.    Therefore, the decision to place W.S.R. and C.D.A. at the Heartland Human Care Services, Inc. facility for unaccompanied minors in Chicago, Illinois violated the FSA, and the children sought review of this placement decision pursuant to Paragraph 24(b) of the Flores Agreement.

103.    An actual controversy exists between Plaintiffs W.S.R. and C.D.A. and Defendants with respect to the actions of Defendants in separating Plaintiffs from their parents in violation of the Flores Settlement Agreement.

104.    The actual controversy between Plaintiffs W.S.R. and C.D.A. and Defendants involves the question of whether Defendants violated W.S.R and C.D.A.'s rights under the Flores Settlement Agreement when Defendants separated Plaintiffs from their fathers and placed them, children who were apprehended as part of an accompanying family, at a facility for unaccompanied minors.

105.    Plaintiffs file the instant Second Amended Complaint for the purpose of obtaining a declaratory judgment finding that Defendants violated Plaintiffs W.S.R. and C.D.A.'s rights under the Flores Settlement Agreement by forcibly separating them from their parents and then placing them at a facility for unaccompanied minors when they were not, in fact, unaccompanied.

Wherefore, Plaintiffs W.S.R. and C.D.A respectfully request that this Court enter a Judgment against Defendant-Respondents Jefferson B. Sessions III in his capacity as the Attorney General of the United States, Kirstjen M. Nielsen in her capacity as the Secretary of Homeland Security, Kevin K. McAleenan in his capacity as Commissioner of U.S. Customs and

Border Protection, Alex M. Azar II in his capacity as the Secretary of the U.S. Department of Health and Human Services, E. Scott Lloyd in his capacity as the Director of the Office of Refugee Resettlement, Ronald D. Vitiello in his capacity as the Acting Director of U.S. Immigration and Customs Enforcement, Ricardo Wong in his capacity as Director of the Immigration and Customs Enforcement Field Office for Enforcement and Removal Operations in Chicago, Illinois, and Margaret Hartnett in her capacity as the Director of the Immigration and Customs Enforcement Field Office for Enforcement and Removal Operations in West Texas as follows:

    A.    For a Declaratory Judgment finding that Defendants violated Plaintiffs rights under the Flores Settlement Agreement by separating Plaintiffs from their fathers and improperly placing them at a facility for unaccompanied minors;

    B.    For all attorneys' fees and costs associated with bringing this action;

    C.    For any other relief this Court deems appropriate under the circumstances.

**Count IV**

**Violation of the Flores Agreement –
Paragraph 12 Violation**

106.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

107.    Neither W.S.R. nor C.D.A. were provided sufficient communication with their respective fathers. They were apprehended together as an asylum-seeking family. As an accompanying child, W.S.R. and C.D.A. had enforceable rights under the settlement to communicate freely with their respective fathers, and those rights were violated.

108.    Therefore, the failure of the Defendants after placing W.S.R. and C.D.A. at the Chicago, Illinois facility to facilitate communication with their fathers violates Paragraph 12 of the Flores Agreement.

Wherefore, Plaintiffs W.S.R. and C.D.A respectfully request that this Court enter a Judgment against Defendant-Respondents Jefferson B. Sessions III in his capacity as the Attorney General of the United States, Kirstjen M. Nielsen in her capacity as the Secretary of Homeland Security, Kevin K. McAleenan in his capacity as Commissioner of U.S. Customs and Border Protection, Alex M. Azar II in his capacity as the Secretary of the U.S. Department of Health and Human Services, E. Scott Lloyd in his capacity as the Director of the Office of Refugee Resettlement, Ronald D. Vitiello in his capacity as the Acting Director of U.S. Immigration and Customs Enforcement, Ricardo Wong in his capacity as Director of the Immigration and Customs Enforcement Field Office for Enforcement and Removal Operations in Chicago, Illinois, and Margaret Hartnett in her capacity as the Director of the Immigration and Customs Enforcement Field Office for Enforcement and Removal Operations in West Texas as follows:

A.     For a Declaratory Judgment finding that Defendants violated Plaintiffs' rights under the Flores Settlement Agreement by failing to facilitate communication between the Plaintiffs and their fathers after their forcible separation;

B.     For all attorneys' fees and costs associated with bringing this action;

C.     For any other relief this Court deems appropriate under the circumstances.

## Count V

## False Imprisonment

109.     All of the foregoing allegations are repeated and realleged as though fully set forth herein.

110.     In forcibly separating the Plaintiffs from their accompanying fathers and placing them improperly at a facility for unaccompanied minors, the Defendants knowingly restrained and detained the Plaintiffs unlawfully so as to interfere substantially with their liberty.

24

111.     A person commits a misdemeanor if he or she knowingly restrains another unlawfully so as to interfere substantially with his or her liberty. *See* 25 C.F.R. § 11.404

112.     Plaintiffs have reported the Defendants' conduct to the Court and to the FBI.

113.     On the basis of the foregoing, the Plaintiffs have been helpful with regard to the detection and investigation of the violations of due process alleged in Count I and the false imprisonment alleged in Count V.

Wherefore, Plaintiffs W.S.R. and C.D.A respectfully request that this Court enter a Judgment against Defendant-Respondents Jefferson B. Sessions III in his capacity as the Attorney General of the United States, Kirstjen M. Nielsen in her capacity as the Secretary of Homeland Security, Kevin K. McAleenan in his capacity as Commissioner of U.S. Customs and Border Protection, Alex M. Azar II in his capacity as the Secretary of the U.S. Department of Health and Human Services, E. Scott Lloyd in his capacity as the Director of the Office of Refugee Resettlement, Ronald D. Vitiello in his capacity as the Acting Director of U.S. Immigration and Customs Enforcement, Ricardo Wong in his capacity as Director of the Immigration and Customs Enforcement Field Office for Enforcement and Removal Operations in Chicago, Illinois, and Margaret Hartnett in her capacity as the Director of the Immigration and Customs Enforcement Field Office for Enforcement and Removal Operations in West Texas as follows:

A.     For a Declaratory Judgment finding that Defendants violated the substantive due process rights of the Plaintiffs by separating Plaintiffs from their fathers and refusing to reunite Plaintiffs with their fathers;

B.     For a Declaratory Judgment finding that  Defendants knowingly restrained the Plaintiffs unlawfully so as to interfere substantially with their liberty;

C.     For the Court to elect to exercise its discretion to grant the Plaintiffs' requests for the issuance of signed I-918 Supplement B forms (judicial certifications for U visa relief[8]);

D.     Award Plaintiffs their reasonable attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d) and other applicable law; and

E.     For any other relief this Court deems appropriate under the circumstances.

.

Respectfully Submitted,


Dated: August 27, 2018                    By:  /s/ Amy Maldonado
                                          Amy Maldonado (IL Bar No. 6256961)
                                          Law Office of Amy Maldonado
                                          333 Albert Avenue, Ste. 610
                                          East Lansing, MI 48823
                                          Phone: (517) 803-2870
                                          Fax: (888) 299-3780
                                          E-mail: amy@amaldonadolaw.com


Dated: August 27, 2018                    By:  /s/ Karen Hoffmann
                                          Karen Hoffmann (PA Bar No. 323622)
                                          ALDEA – The People's Justice Center
                                          532 Walnut Street
                                          Reading, PA 19601
                                          Phone: (484) 926-2014
                                          Fax: (484) 926-2032
                                          E-mail: karen@aldeapjc.org


Dated: August 27, 2018                    By:  /s/ Bridget Cambria
                                          Bridget Cambria (PA Bar No. 205271)
                                          Cambria & Kline, P.C.
                                          532 Walnut Street
                                          Reading, PA 19601
                                          Phone: (484) 926-2014
                                          Fax: (484) 926-2032
                                          E-mail: bridget.cambria@cambriaklinelaw.com

---

[8] *See, e.g., Villegas v. Metro. Gov't of Nashville & Davidson County*, 907 F. Supp. 2d 907 (M.D. Tenn. 2012).

26

Dated: August 27, 2018      By: /s/ Thomas P. Yardley
         Thomas P. Yardley (IL Bar No. 6208239)
         Robbins, Salomon & Patt, Ltd.
         180 N. LaSalle Street, Ste. 3300
         Chicago, IL 60601
         Phone: (312) 456-0184
         Fax: (312) 782-6690
         E-mail: tpyardley@rsplaw.com

Dated: August 27, 2018      By: /s/ Katrina A. Hausfeld
         Katrina A. Hausfeld (IL Bar No. 6296747)
         Amy M. Rubenstein (IL Bar No. 6278353)
         DLA Piper LLP (US)
         444 West Lake Street, Ste. 900
         Chicago, IL 60606
         Phone: (312) 368-3484
         Fax: (312) 251-2886
         E-mail: katrina.hausfeld@dlapiper.com
         Email: amy.rubenstein@dlapiper.com


         /s/ John R. Wellschlager
         John R. Wellschlager (MD Bar. No. 9612190272)
         DLA Piper LLP (US)
         6225 Smith Avenue
         Baltimore, MD 21209
         Phone: (410) 580-4281
         Fax: (410) 580-3281
         E-mail: john.wellschlager@dlapiper.com


         /s/ Peter J. Farrell
         Peter J. Farrell (MN Bar No. 0393071)
         DLA Piper LLP (US)
         80 South Eighth Street, Ste. 2800
         Minneapolis, MN 55402-2103
         Phone: (612) 524-3035
         Fax: (612) 524-3066
         E-mail: peter.farrell@dlapiper.com


         /s/ Leeanne S. Mancari
         Leeanne S. Mancari (CA Bar No. 275535)
         DLA Piper LLP (US)
         2000 Avenue of the Stars
         Suite 400, North Tower

Los Angeles, CA  90067-4704
Phone: (310) 595-3088
Fax: (310) 595-3414
E-mail: leeanne.mancari@dlapiper.com

ATTORNEYS FOR THE PLAINTIFF